**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

DONNELL MCCORMICK,                )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        1:17CV483
                                  )
NANCY A. BERRYHILL,               )
Acting Commissioner of Social     )
Security,                         )
                                  )
                Defendant.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Donnell McCormick, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB").  (Docket Entry 1.)  Defendant has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 9, 11; see also Docket Entry 10 (Plaintiff's Memorandum); Docket Entry 12 (Defendant's Memorandum)).  For the reasons that follow, the Court should enter judgment for Defendant.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging an onset date of July 31, 2012.  (Tr. 163-72.)  Upon denial of that application initially (Tr. 74-85, 105-13) and on reconsideration (Tr. 86-100, 115-22), Plaintiff requested a hearing de novo before an Administrative Law

Judge ("ALJ") (Tr. 123-24). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 38-69.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 20-33.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 10-15, 16-19, 332-34), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through September 30, 2018.

2. [Plaintiff] has not engaged in substantial gainful activity since July 31, 2012, the alleged onset date.

3. [Plaintiff] has the following severe impairments: post-traumatic stress disorder (PTSD); psychotic disorder; cognitive disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations: he can understand and perform generally simple, routine repetitive tasks; he can maintain concentration, persistence and pace to stay on task for 2 hour periods over a typical 8 hour workday in order to perform such tasks; he requires a low stress setting, which, in addition to the nature of the work being performed, is further defined to mean a work setting that is not production-pace or quota-based work, rather a

goal-oriented job primarily dealing with things as opposed to people, with no more than occasional changes in the work setting; he is limited to occasional social interaction with supervisors and co-workers; but he must not be required to work with the public as part of the job, such as sales or negotiation, though this would not preclude incidental or casual contact as it may arise in a workday.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from July 31, 2012, through the date of this decision.

(Tr. 26-33 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

4

[Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment,

---

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

the ALJ must assess the claimant's residual functional capacity ("RFC")." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

## B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ's decision was not based on substantial evidence where [three] mental health professionals opined that [] [P]laintiff could not handle the mental demands of work" (Docket Entry 10 at 4 (bold font omitted));

2) "[t]he ALJ erred, as a matter of law, in evaluating [Plaintiff's] mental abilities necessary for performing unskilled work" (id. at 7 (bold font omitted)); and

3) "[t]he ALJ did not consider nor evaluate [Plaintiff's] mental impairments in light of [Social Security Ruling 85-15, Titles II and XVI: Capability to Do Other Work — the Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments, 1985 WL 56857 (1985) ("SSR 85-15")]" (id. at 9 (bold font omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (Docket Entry 12 at 3-17.)

### 1. Opinion Evidence

In Plaintiff's first issue on review, he contends that "the ALJ's decision was not based on substantial evidence where [three] mental health professionals[, consultative examiner Dr. William P. Keeton, consultative examiner Dr. Bert A. Lucas, and Licensed Professional Counselor Jaime Reyes-Gonzales,] opined that []

[P]laintiff could not handle the mental demands of work." (Docket Entry 10 at 4 (referencing Tr. 234-37, 353-57, 359-60, 382-83) (bold font omitted).) Plaintiff asserts that, in further support of those mental health professionals' opinions, Dr. John Wagnitz and Licensed Clinical Social Worker Susan Modlin assigned Plaintiff Global Assessment of Functioning ("GAF") scores of 50 and 43, respectively, which reflected Plaintiff's "inability to tolerate the stress and pressures associated with day-to-day work activity." (Id. at 5 (citing Tr. 377, 397).)[5] According to Plaintiff, the ALJ "fail[ed] to give proper deference to [] [P]laintiff's mental health providers." (Id. at 7.) In addition, Plaintiff argues that the ALJ "ignored evidence that although [Plaintiff's] condition improved with medication and treatment, his symptoms continued to persist." (Id. at 6 (citing Tr. 410).) Plaintiff's contentions miss the mark.

The ALJ must evaluate medical source opinions using the factors outlined in 20 C.F.R. § 404.1527(c)(1) through (6), and expressly indicate and explain the weight he or she affords to such opinions. See 20 C.F.R. § 404.1527(c) ("Regardless of its source, [the ALJ] will evaluate every medical opinion [he or she]

_____

[5] The GAF is a numeric scale from 0 to 100 representing a clinician's judgment of an individual's social, occupational and school functioning "on a hypothetical continuum of mental health-illness." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) ("DSM-IV-R"). A GAF of 41 to 50 reflects "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." Id. A new edition of the leading treatise discontinued use of the GAF. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

receive[s]" and where an opinion does not warrant controlling weight, [the ALJ must] consider all of the . . . factors [in 20 C.F.R. § 404.1527(c)(1)-(6)] in deciding the weight [to] give to any medical opinion." (emphasis added)); Social Security Ruling 96-5p, Medical Source Opinions on Issues Reserved to the Commissioner, 1996 WL 374183, at *5 (July 2, 1996) ("SSR 96-5p") (noting that ALJs "must weigh medical source statements . . . [and] provid[e] appropriate explanations for accepting or rejecting such opinions"); Social Security Ruling 96-8p, Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 96-8p") ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."); see also Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984) (holding that reviewing court generally "cannot determine if findings are supported by substantial evidence unless the [ALJ] explicitly indicates the weight given to all of the relevant evidence").

a. Dr. Keeton

Dr. Keeton, a clinical psychologist, assessed Plaintiff on August 14 and August 23, 2012, as part of a fitness for duty evaluation for Plaintiff's then-employer following an incident between Plaintiff and his supervisor on July 31, 2012. (See Tr. 48, 234, 235, 241, 243.) Following those assessments, Dr. Keeton

10

provided Plaintiff's employer with a Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act ("FMLA") (Tr. 234-37), on which Dr. Keeton described Plaintiff's PTSD as a "chronic condition since childhood," but noted that the "acute phase" of the condition began on July 31, 2012, the date of the incident involving Plaintiff and his supervisor. (Tr. 235.) Dr. Keeton opined that the acute phase of Plaintiff's PTSD would "probabl[y]" last "[six] months if [Plaintiff remained] separated from [his work] environment and with appropriate treatment," including "[c]ognitive behavioral therapy . . . weekly for six months." (Id.) Dr. Keeton deemed Plaintiff "unable" to perform his prior job as a corrections officer (Tr. 236), because Plaintiff could not "[t]olerate stress, [and] perceived and real threat[s], without high risk of overreaction, creating unsafe conditions" (Tr. 235). Dr. Keeton predicted that Plaintiff would remain "incapacitated" by his PTSD from August 14, 2012, to August 14, 2014. (Tr. 236.)

The ALJ discussed Dr. Keeton's opinions as follows:

> The [ALJ] has reviewed and considered [Plaintiff's] FMLA forms, which were signed by [Dr. Keeton]. [Dr. Keeton] . . . projected [Plaintiff's] PTSD would render him unable/unfit to work between August 2012 and August 2[014], which is quite incomprehensible! He noted [Plaintiff] . . . had difficulty tolerating stress, perceived and real threats, without high risk of overreaction, and creating unsafe conditions. This report was generated in December 2012 based upon assessments in August 2012. The [ALJ] assigns greater weight to [Plaintiff's] therapy and treatment records, which document improvement after the initial occurrence

> in 2012. His mental status exams have generally been
> benign with treatment and medications have been
> consistent with little change.

(Tr. 31 (internal citations omitted).) Plaintiff did not specifically attack any portion of the ALJ's analysis of Dr. Keeton's opinions (see Docket Entry 10 at 4-7) beyond Plaintiff's generalized assertion that the ALJ "fail[ed] to give proper deference to [] [P]laintiff's mental health providers" (id. at 7). Plaintiff has failed to demonstrate any error with respect to the ALJ's analysis of Dr. Keeton's opinions.

The ALJ implicitly credited Dr. Keeton's opinion that Plaintiff could no longer perform his corrections officer job (see Tr. 236), as the ALJ found that Plaintiff lacked the RFC to return to his past relevant work (see Tr. 32). Moreover, the ALJ provided an "appropriate explanation[]," SSR 96-5p, 1996 WL 374183, at *5, for discounting Dr. Keeton's opinion that Plaintiff could not tolerate stress and threats without high risk of overreaction (see Tr. 235), e.g., treatment notes documenting improvement in Plaintiff's condition and benign mental status examinations (see Tr. 31). Furthermore, the ALJ did not err by finding Dr. Keeton's two-year incapacitation opinion "quite incomprehensible" (Tr. 31), where Dr. Keeton also opined that the acute phase of Plaintiff's PTSD would probably last six months if Plaintiff remained separated from his work environment and pursued appropriate treatment (see Tr. 236). The record reflects that Plaintiff did not return to his

job as a corrections officer (see Tr. 45-46, 48), and participated in therapy on a regular basis following the July 2012 incident with his supervisor (see Tr. 368-79, 382-83, 392-423).  Thus, the ALJ reasonably concluded Dr. Keeton's two-year incapacitation opinion lacked an adequate foundation.

b. Dr. Lucas

Dr. Lucas conducted a consultative psychological examination of Plaintiff on March 27, 2013 (see Tr. 353-57), and opined that Plaintiff could "understand, retain and follow instructions," and that, despite "some difficulty focusing and concentrating at times," he remained "able to perform simple, routine[,] repetitive tasks [('SRRTs')]."  (Tr. 356.)  Dr. Lucas further noted that Plaintiff possessed "an adequate ability at relating with others but . . .  remain[ed] overwhelmed with symptoms consistent with PTSD" and, thus, "would have difficulty tolerating the stress and pressure associated with day-to-day work activity at th[at] time." (Id.)  Dr. Lucas assigned Plaintiff a GAF score of 55 (Tr. 356), indicating "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning," American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) ("DSM-IV-R") (bold font omitted).

The ALJ provided the following evaluation of Dr. Lucas's opinions:

Dr. Lucas's opinion is granted partial weight, since he noted [Plaintiff] was able to understand, retain and

> follow instructions, able to perform SRRTs; and able to
> relate to others adequately; though [Dr. Lucas] observed
> [Plaintiff] was "overwhelmed with symptoms consistent
> with PTSD," which would cause him to have difficulty
> tolerating the stress and pressures associated with day-
> to-day work "at this time." The [ALJ] concurs
> [Plaintiff] would have difficulty tolerating the stress
> and pressures of day-to-day work, as reflected in the
> limitations of his [RFC], yet Dr. Lucas's opinion is
> vague and not longitudinal; he also provided a moderate
> GAF estimate, which generally means he did not believe
> [Plaintiff] was necessarily disabled because of his PTSD.

(Tr. 31 (internal citation omitted).) Again, Plaintiff did not

specifically challenge the ALJ's discussion of Dr. Lucas's opinions

(see Docket Entry 10 at 4-7), but argued that the ALJ should have

given those opinions "proper deference" (id. at 7). Plaintiff has

failed to demonstrate that the ALJ erred in his analysis of Dr.

Lucas's opinions.

The ALJ provided an "appropriate explanation[]" SSR 96-5p,

1996 WL 374183, at *5, for discounting Dr. Lucas's opinions. As

the ALJ recognized (see Tr. 31), difficulty tolerating stress does

not equate to an inability to tolerate any stress, particularly in

the setting of a moderate GAF score. Moreover, the ALJ adequately

accommodated Plaintiff's compromised ability to tolerate stress by

including restrictions in the RFC to SRRTs and "a low stress

setting, . . . further defined to mean a work setting that is not

production-pace or quota-based work, rather a goal-oriented job

primarily dealing with things as opposed to people, with no more

than occasional changes[,] . . . occasional social interaction with

supervisors and co-workers," and only "incidental or casual contact" with the public (Tr. 28-29).

c. Counselor Reyes-Gonzales

Counselor Reyes-Gonzales submitted three memoranda which summarized Plaintiff's record of treatment with her. (See Tr. 347-48, 359-60, 382-83.)[6] Counselor Reyes-Gonzales indicated that Plaintiff had attended a total of 37 counseling sessions from August 30, 2012, to June 6, 2014, when he transferred his care to Daymark Recovery Services. (See Tr. 359, 382-83.) Counselor Reyes-Gonzales noted a diagnosis of PTSD, and stated that Plaintiff did "not seem[] to be capable of handling much more stress due to his levels of anxiety as a result of his past history of trauma." (Tr. 382; see also Tr. 359.) In all three memoranda, Counselor Reyes-Gonzales cautioned that "it would be out of our scope of practice to determine [Plaintiff's] present results of treatment and/or his fitness for duty at work," because the latter "determination . . . should be made by a [m]edical [d]octor." (Tr. 383; see also Tr. 348, 360.)

The ALJ summarized the contents of Counselor Reyes-Gonzales's memoranda, emphasizing her notation of Plaintiff's "largely unremarkable mental status examination findings," and her observation that Plaintiff "appeared to find pleasure when attending church activities and [having] contact with his family."

---

[6] The record does not contain any of Counselor Reyes-Gonzales's actual treatment notes.

15

(Tr. 30.)  The ALJ noted that Counselor Reyes-Gonzales "refused to provide any statements and believed that a fitness for duty determination should be made by a medical doctor." (Id.)  The ALJ neither expressly discussed Counselor Reyes-Gonzales's statement that Plaintiff did "not seem[] to be capable of handling much more stress due to his levels of anxiety," nor assigned a weight to that statement.  (See id.)  As with Drs. Keeton and Lucas, Plaintiff argued only that the ALJ should have given Counselor Reyes-Gonzales's statement "proper deference" (Docket Entry 10 at 7) and did not raise any particular assignment of error concerning the ALJ's evaluation of that statement (see id. at 4-7).  For the reasons that follow, the Court should discern no such error.

As an initial matter, doubt exists as to whether Counselor Reyes-Gonzales's statement even amounts to a medical opinion warranting assignment of weight by the ALJ.  By using the phrasing that Plaintiff did "not seem[] to be capable of handling much more stress" (Tr. 382 (emphasis added); see also Tr. 359), Counselor Reyes-Gonzales couched her statement as more of an observation than a definitive opinion.  Moreover, as the ALJ recognized (see Tr. 30), Counselor Reyes-Gonzales offered that statement in the same document in which she stressed that opinions as to Plaintiff's response to treatment and fitness for duty qualified as outside the scope of her practice and warranted consideration by a medical doctor (see Tr. 359-60, 382-83).

Even if Counselor Reyes-Gonzales's statement amounted to an opinion, which the ALJ erred by not weighing, any such error would remain harmless under the circumstances of this case. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a [Social Security] case in quest of a perfect opinion [from an ALJ] unless there is reason to believe that the remand might lead to a different result."). An opinion that an individual seems not to be capable of handling much more stress does not equate to an unequivocal preclusion of all stress, and the ALJ accommodated Plaintiff's decreased ability to handle stress by including the limitations in the RFC detailed above.

d. GAF Scores

Plaintiff asserts that Dr. Wagnitz and Social Worker Modlin assigned Plaintiff GAF scores of 50 and 43, respectively (Docket Entry 10 at 5 (citing Tr. 377, 397)), which "are assigned to individuals who have serious . . . symptoms or . . . serious . . . problems with social, occupational or school functioning" (id. at 6). According to Plaintiff, those GAF scores reflected Plaintiff's "inability to tolerate the stress and pressures associated with day-to-day work activity" (id. at 5), and "supported [and] corroborated" the opinions of Drs. Keeton and Lucas and Counselor Reyes-Gonzales (id. at 6).

The ALJ analyzed those GAF scores as follows:

> [Plaintiff] was also treated at Daymark, where he relayed
> a history of a bad experience at his job that occurred in
> July 2012. He reported situational and family stressors,
> but his mental status examination findings were not
> abnormal. The GAF score of 43 was noted, but it was
> assessed at a time when [Plaintiff] was under relatively
> intense situational stressors, per self-report, and not
> indicative of [Plaintiff's] functioning throughout the
> period in question.
>
> . . .
>
> . . . [I]n July 2013 Dr. Wagnitz diagnosed [Plaintiff]
> with psychotic disorder with a GAF of 50 based on
> [Plaintiff's] self-report of audio and visual
> hallucinations. However, [Plaintiff] testified that his
> medications helped alleviate these symptoms. The GAF
> score of 50 is granted partial weight, as it is not
> consistent with the psychiatric evaluation findings at
> the time of the assessment, or with the longitudinal
> record, establishing improvement with sustained
> treatment. More recent therapy notes from Daymark reveal
> relatively benign mental status examination findings and
> focus primarily on [Plaintiff's] past work and difficulty
> moving forward, despite his stressors. In addition,
> [Plaintiff] displayed no significant PTSD symptoms and
> [stated] that his therapy had been helpful.

(Tr. 30-31 (internal citations omitted).) Notably, although

Plaintiff included nearly the entire discussion quoted above in his

brief in support of his instant motion (see Docket Entry 10 at 6),

he did not specifically assign any error to that evaluation (see

id. at 6-7). That failure forecloses relief. See United States v.

Zannino, 895 F.2d at 17 ("[A] litigant has an obligation to spell

out its arguments squarely and distinctly, or else forever hold its

peace." (internal quotation marks omitted)); Hughes v. B/E

Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C.

Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not

expect a court to do the work that it elected not to do.").  In any event, the Court should find that the ALJ provided "appropriate explanations," SSR 96-5p, 1996 WL 374183, at *5, for discounting the GAF scores.  <u>See</u> 20 C.F.R. § 404.1527(c)(3) & (4) (permitting ALJs to assign less weight to opinions where not supported by objective findings or inconsistent with the record as a whole).

e. <u>Evidence of Persistent Symptoms</u>

Plaintiff contends that the ALJ "ignored evidence that although [Plaintiff's] condition improved with medication and treatment, his symptoms continued to persist."  (Docket Entry 10 at 6 (citing Tr. 410).)  In particular, Plaintiff points to a March 10, 2014, evaluation by Dr. Wagnitz in which Plaintiff reported that he "'continue[d] to have some nightmares about his jail experience as well as his history of abuse," and that, despite "regularly taking the higher dose of Haldol . . . for hallucinations, [he] continue[d] to have visual hallucinations at times.'"  (Docket Entry 10 at 6 (quoting Tr. 410).)  Plaintiff further notes that "Dr. Wagnitz described [P]laintiff's mood as one of anxiety and secondary depression about his income and having to divest property."  (<u>Id.</u>)  According to Plaintiff, "[t]he fact that he continued to present with anxiety, depression, and hallucinations after being away from the workplace for almost two years is indicative of his inability to tolerate the stress and

pressure that employment would have added to his life." (Id. at 7.) Those contentions do not warrant relief.

Plaintiff focuses on one particular psychiatric visit on March 10, 2014, and faults the ALJ for not specifically discussing it. (Id. at 6 (citing Tr. 410).) However, the ALJ cited to several of Plaintiff's treatment records from September 30, 2013 to October 16, 2014, including the March 10, 2014, treatment note in question, following a paragraph in which he indicated that "[m]ore recent therapy notes from Daymark reveal relatively benign mental status examination findings and focus primarily on [Plaintiff's] past work and difficulty moving forward, despite his stressors," and that "[Plaintiff] displayed no significant PTSD symptoms and [stated] that his therapy had been helpful." (Tr. 31 (citing Tr. 387, 388, 399, 410, 414).) Although the ALJ summarized those records rather than listing all of Plaintiff's subjective complaints and the objective findings in each record, the ALJ need not discuss every finding in each piece of evidence in the record in issuing decisions on disability, see, e.g., Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Finally, as the Commissioner argues (see Docket Entry 12 at 8), the ALJ clearly did recognize that Plaintiff still experienced mental symptoms despite improvement with medication and therapy, as

the ALJ included significant mental limitations in the RFC, including restrictions to SRRTs and low stress work (see Tr. 28).

In sum, Plaintiff's first assignment of error fails as a matter of law.

## 2. Mental RFC

Next, Plaintiff asserts that "[t]he ALJ erred, as a matter of law, in evaluating [Plaintiff's] mental abilities necessary for performing unskilled work." (Docket Entry 10 at 7 (bold font omitted).) In particular, Plaintiff maintains that "'[a] substantial loss of ability to meet any of the basic mental demands [of unskilled work] would severely limit the potential occupational base and thus would justify a finding of inability to perform other work even for persons with favorable age, education and work experience.'" (Id. (citing Program Operations Manual System ("POMS") DI 25020.010A.3.b. (Mental Limitations), https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010) (last accessed January 26, 2018); see also id. at 8 (citing Social Security Ruling 96-9p, Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 1996 WL 374185, at *9 (July 2, 1996) ("SSR 96-9p") ("A substantial loss of ability to meet any one of several basic work-related activities on a sustained basis . . . will substantially erode the unskilled sedentary occupational base and

would justify a finding of disability").)  In that regard, Plaintiff contends that the ALJ's finding that Plaintiff "was limited to only occasional changes in the work setting and only occasional interaction with supervisors and co-workers" amounts to "a substantial loss of ability to meet the mental demands of work," and that "a finding of disability should have resulted."  (Id. at 8 (citing Tr. 28-29, and Social Security Ruling 83-10, Titles II and XVI: Determining Capability to Do Other Work – the Medical-Vocational Rules of Appendix 2, 1983 WL 31251, at *5 (1983) (defining "occasional" as occurring from very little up to one-third (or less than two hours) of a work day)).)  Plaintiff has not established entitlement to relief.

As an initial matter, by its very terms, SSR 96-9p does not apply to Plaintiff's case.  That Ruling applies to claimants with "[a]n RFC for less than a full range of sedentary work," which "reflects very serious limitations . . . and is expected to be relatively rare."  SSR 96-9p, 1996 WL 374185, at *1.  By contrast, the ALJ did not assign Plaintiff any exertional limitations in the RFC, thus finding him capable of performing work at all exertional levels.  (See Tr. 28-29.)

Moreover, the POMS section relied on by Plaintiff does not mandate a finding of disability, because limitations to occasional workplace changes and occasional interaction with supervisors and co-workers do not constitute a "substantial loss" of ability to

perform those mental work demands, as shown by the POMS section's own definition of "[s]ubstantial loss":

> "Substantial loss" cannot be precisely defined. It does not necessarily relate to any particular adjective, number, or percentage. In practical terms, <u>an individual has a substantial loss of ability to perform a basic mental activity when he or she cannot perform the particular activity in regular, competitive employment but, at best, could do so only in a sheltered work setting where special considerations and attention are provided</u>.

POMS DI 25020.010A.3.b (emphasis added); <u>see also</u> <u>Wright v. Colvin</u>, No. 1:15-CV-00415(MAT), 2017 WL 6616378, at *4 (W.D.N.Y. Dec. 27, 2017) (unpublished) (dismissing the plaintiff's contention that occasional ability to make work-related decisions amounted to "substantial loss" of such ability under POMS DI 25020.010A.3.b., because that POMS section "expressly notes that '[s]ubstantial loss cannot be precisely defined . . . and . . . does not necessarily relate to any particular adjective, number, or percentage[]' [and t]hus, the adjective 'occasional' does not lead to an automatic finding of disability"). The ALJ clearly did not find in the RFC that Plaintiff could only handle workplace changes and interact with supervisors and coworkers "in a sheltered work setting where special considerations and attention are provided," <u>id.</u> (<u>See</u> Tr. 28-29.)

Moreover, the ALJ asked the VE whether jobs existed in significant numbers in the national economy that Plaintiff could perform if limited to, <u>inter alia</u>, occasional workplace changes and

23

occasional interaction with supervisors and co-workers, and the VE responded that Plaintiff could perform the jobs of floor worker, auto detailer, and general laborer. (See Tr. 64-66.) The ALJ adopted the VE's testimony, and found, at step five of the SEP, that Plaintiff could perform those three jobs notwithstanding limitations to occasional workplace changes and interaction with supervisors and co-workers. (See Tr. 33.) The VE's testimony thus undermines Plaintiff's contention that limitations to occasional changes and occasional interaction caused a "substantial loss" in her ability to perform those mental demands and therefore disabled her. See Rogers v. Colvin, No. 3:15-5938-DWC, 2016 WL 3344573, at *4 (W.D. Wash. June 15, 2016) (unpublished) (rejecting the plaintiff's argument that she suffered "substantial loss" in ability to perform mental demands of work under POMS DI 25020.010A.3.b., where VE testified that RFC limiting Plaintiff's contact with males and requiring supportive supervisor caused 30% erosion of occupational base, "thereby leaving . . . 70% of jobs existing in the national economy available to [the p]laintiff"); McPeters v. Astrue, No. CIV.A.1:07-CV-0112-C, 2008 WL 4414542, at *11 (N.D. Tex. Sept. 30, 2008) (unpublished) (holding that RFC with restrictions to "one- and two-step work instructions and . . . only incidental contact with the public and no collaboration with co-workers" did "not encompass findings indicating that [the p]laintiff ha[d] experienced a substantial loss in the ability to

perform the basic mental demands of unskilled work" where VE testified that individual with those limitations could still perform jobs in the national economy).

In short, Plaintiff's second issue on review does not entitle him to relief.

### 3. SSR 85-15

Lastly, Plaintiff asserts that "[t]he ALJ did not consider nor evaluate [Plaintiff's] mental impairments in light of SSR 85-15," which emphasizes that "'[t]he reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances.'" (Docket Entry 10 at 9 (bold font omitted) (quoting SSR 85-15, 1985 WL 56857, at *6).) More specifically, Plaintiff maintains that the RFC's limitation to occasional "social interaction" with supervisors and co-workers "d[id] not go far enough nor d[id] it reflect the difficulty that [P]laintiff would have with tolerating supervision or tolerating having his work judged, evaluated and critiqued." (Id. at 10 (emphasis added).) In that regard, Plaintiff contends that "the RFC should have addressed his ability to accept instructions and respond appropriately to criticism from supervisors." (Id.) These allegations fail as a matter of law.

Plaintiff's argument relies on an overly narrow interpretation of the word "social" in the RFC. (Id.) According to Plaintiff,

the ALJ's limitation to "occasional _social_ interaction with supervisors and co-workers" (Tr. 28 (emphasis added)) did not address <u>work-related</u> interactions Plaintiff would have with supervisors, such as receiving instructions or criticism from supervisors (Docket Entry 10 at 10). However, the ALJ's reliance on the state agency psychological consultants' opinions belies Plaintiff's position. The consultants each opined that, because Plaintiff had "moderate[] limit[ation]" in, <u>inter alia</u>, "[t]he ability to accept instructions and respond appropriately to criticism from supervisors," he required a job that did not involve much social interaction. (Tr. 81, 96; <u>see also</u> Tr. 93 (indicating that Plaintiff needed "a position with reduced _social_ demands").) The ALJ assigned "great weight" to the consultants' opinions, noting that "both [consultants] opined [Plaintiff] could perform [SRRTs] in a low stress work setting with <u>limited social contact/interaction</u>, which the [ALJ] has provided for in [Plaintiff's] [RFC]." (Tr. 31 (emphasis added).) Thus, the ALJ accounted for Plaintiff's moderate limitation in ability to accept instructions and respond appropriately to criticism, as the state agency consultants did, by limiting Plaintiff to occasional social interaction with supervisors and co-workers.

Accordingly, Plaintiff's third assignment of error does not warrant reversal or remand.

26

### III.   CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 9) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 11) be granted, and that this action be dismissed with prejudice.


                    /s/ L. Patrick Auld
                 **L. Patrick Auld**
           **United States Magistrate Judge**


February 8, 2018